Each task had a specific dollar amount for it. Now, could the government have not wanted to do one of them? Perhaps, but it was all fixed. If the government picked up a project, it was at a fixed price. That was how it was all bid. I understand, but they had the option of saying, well, there's no work under this task. They could have done that. Okay. Your time has expired. We thank both counsel. The case is submitted. Your argument next in number 2012-1179, Senju Pharma v. Apotex. Mr. Kelly, when you're ready. Good morning, Your Honors. May it please the Court. The claim on appeal in this case is a method for preventing the precipitation of gatafloxacin crystals from an aqueous medium containing these gatafloxacin by adding sodium EDTA. The claim defines what the problem is that was solved, and that is the precipitation of gatafloxacin from the product of the issue of ophthalmic solutions. The court below found that the prior art, the 456, 465, and 470 patents, plus the Riley reference, were insufficient to meet Apotex's burden of proof. More was needed to prove invalidity. This is the failure of proof we discussed in our brief. So in what year was the relationship between solubility and precipitation discovered as a general matter in chemistry? Was that like recent? Your Honor, there's no evidence in the record. The 18th century, right? This is a principle that goes back. I can tell you that it's at least back to 1962, because that's when I learned it in chemistry in kind school. Your Honor, the issue, I think this relationship has nothing to do with really preventing precipitation. which is dealing with this problem, says in 2009 that the current understanding of precipitation kinetics and precipitation inhibition, which is what this claim is directed to, is rather limited. That's 2009, people talking about pharmaceutical formulation. Let me make sure we're on the same page here in terms of talking about the general basic principle, as the judge alluded to. My understanding is that it is a quite simple axiom of chemistry that if you do something to reduce the solubility of a substance in a liquid, that you will have increased the amount of precipitation. But by virtue of precipitation out of the solution, correct? As a general matter. If we take it in the ideal world outside of this courtroom, I will agree with you. Okay, that's the only general principle. You raised a good point, and I want to take you to the patent, because the patent describes exactly what we're talking about here and the problem. And that is really shown in column four, which is on page A92 of the appendix. And it's experiment two. And there, what we show is we take three gatafloxacin solutions, all at the same concentration, one with EDTA, and two with different concentrations of EDTA. Now, if you read underneath table three, it describes what happens when we put them through this freeze-thaw test. Before they're frozen, everything's in solution. You then freeze it, and then you bring it back, you thaw it, and bring it back to room temperature. Now, for two or three cycles, the material without EDTA returns to solution. Solubility wasn't the issue. What happens as you continue to the full ten cycles is the material without EDTA, in fact, precipitates. It begins all done by the fourth cycle. The one with EDTA goes through all ten freeze-thaw cycles. Gatafloxacin started out soluble and it finished soluble after the first go-around with all of them. So, solubility of gatafloxacin is not the issue. Something else is causing the precipitation. Dr. Curatolo talks about that in his testimony we quote in our brief, that you don't know what's happening here. What we do know is increasing gatafloxacin solubility is not what the issue is here. The issue is preventing its precipitation. And those kinetics are not well understood even as of 2009. Now, what we did is we went out and we took and repeated the prior... Now, the whole court's underlying assumption here is that gatafloxacin and norfloxacin, a structurally related fluoroquinolone, and we're not disputing that, would behave similarly under similar conditions. The fact is that they didn't. When we tested norfloxacin... What does your testing have to do with this? I mean, everybody's always saying don't use hindsight for an obviousness issue. What in heaven's name is the relevance of testing that you did in the course of a district court proceeding? Why should we consider that at all? Because, Your Honor, it goes and attacks one of the very fundamental bases... It's not known by somebody. That testing was not known by someone skilled in the art at the time this patent application was filed or the invention was made. What's the relevance of the testing? If they come in with testing that showed the opposite, you'd say it was irrelevant. We can't consider that, can we? Your Honor, it goes to whether or not... Let's take a look at what the underlying principle here is, and that is the structural similarity... You're not addressing my question. My question is how could this possibly be relevant since it wasn't this testing that you did was not known at the relevant time to someone skilled in the art. The solution was certainly known that we tested, because that's the prior art solution. So that was known. And what the court is saying below is that it would be obvious to substitute gatafloxacin for fornofloxacin and that one would expect the two would work the same way. And what it shows is that they didn't. They worked the opposite way. That's what it's relevant for. So if they come in with new testing after the fact, that would also be relevant? If they came in and had shown that norfloxacin and gatafloxacin behaved exactly the same way in the freeze-thaw testing, yes, I think it would be. And I think it speaks volumes that they did nothing. Well, that would be a big change in patent law. Your Honor, I think unexpected results are done by such testing all the time. The question is if it's expected at the time of the invention or the application. Well, I agree. At the time of the invention, I think the testimony is uncontradicted, and it's from Apotex's own formulators. They're Apotex's formulation manager. They're vice president of product development, liquid dose. They're analytical manager, liquid dose. I'll testify. I've never heard of BDTA preventing any precipitation of anything. The same as Dr. Stella, who's been in the field for 40 years. No recognition of BDTA preventing precipitation. If you go to the 465... But there is recognition of it affecting solubility in the Riley reference, right? No. Riley, Your Honor, is silent with respect to EDTA, gatafloxacin, or preventing precipitation. And that's where this test does come into account. Not only does it show... Well, Riley talks about carboxylic acids of which EDTA is one, correct? That's correct. So Riley gets pretty close. It's talking about a generic group of compounds of which EDTA is a prime example. And that is increasing the solubility of the quinolones of which gatafloxacin is one, correct? Your Honor, what Riley... Isn't that what Riley says? Your Honor, I would beg to differ a little bit. Because Riley, he doesn't do any testing. He's a review article, and he looked at 24 different salt formers, Your Honor. Including carboxylic acids. I grant you that. But what his conclusion was... Was that this indicates it's not possible to predict the solubility of various salt forms a priori. You need to experiment. And, if you go back to the patent, why do you put EDTA in with gatafloxacin since it's already soluble without it? We show that in Example 2. Solubility is preventing precipitation, which is different here. We're talking about precipitation and preventing it in drug solutions. And the way you do it, the way you test for that, is you do the freeze-thaw testing. This is what Senju does with every liquid formulation. This is what Pfizer did, as Dr. Curatow will testify to. And this is a test that's done to make sure these things are, in fact, going to be stable. And what we found, that unlike anything else, with gatafloxacin, EDTA prevented that precipitation. There's no evidence, other than supposition from Riley, that maybe selected carboxylic acids might improve solubility. But that's not what we're concerned with. If we accepted the proposition that the prior art established that EDTA increased solubility. Let's assume that, and I understand you take issue with that proposition. But let's assume that's in the prior art, and we conclude it's there. Does that, do you think, leave one of ordinary skill in the art to conclude, as recited in Claim 7, that one would expect that adding EDTA to a gatafloxacin solution would prevent precipitation, or at least reduce the point at which precipitation would occur? Absolutely not, your honor. Because as we've shown in the patent tests, we had the same pH for all the tests. But stay with me. Sure. What I'm saying is, given that we've already agreed that there is a general chemical understanding, that there's an inverse relationship between solubility and precipitation. We accept that as a general matter. Right? At the beginning of the argument, we settled on that. Right? Aye. Yes. Your honor. Okay. All right. And we further conclude by my hypothesis that adding EDTA to a gatafloxacin solution increases the solubility of that solution. If you put those two propositions together, is it not the case that a person of ordinary skill in the art would expect that the precipitation would be reduced? Not when you're dealing with the test in the patent. The test in the patent is a specific test. It's the only one that's on the record for testing for precipitation. And it's the one that was accepted by the court below for infringement, where we put it into a freeze-thaw system. And the fact is that gatafloxacin, with or without EDTA, for some cycles, it starts in solution. We freeze it. We thought it's in solution. The difference is, and that's without EDTA, it's with EDTA. The difference is if I've got EDTA, it's going to stay in solution longer. The assumption that you're making, your honor, is that we know what happens in the freezing step. We don't. So why isn't it obvious to try? I mean, if there's a relationship in general between solubility and precipitation, and there's this Riley reference that suggests that adding EDTA increases solubility, why wouldn't one be tempted to try that? Solubility doesn't explain the freeze-thaw test. And I want to take it back to Broward. In 2009, here's a fellow who is directed specifically to preventing precipitation, your honor. And he says that the kinetics and precipitation inhibition, the understanding of it, is rather limited. So the assumption, you're looking, and that's in 2009, and now you go back to 2011. In 1998, the mechanism by which it may operate, the chemical mechanism may not be understood. The phenomenon, however, it would seem to me, is at least as justicious. Well, if you even Riley discusses kinetics, and he says specifically that kinetics can trump, and he shows examples of where it trumps thermodynamics. So this is not a simple situation. Okay. We'll save the rest of your rebuttal time, and let's hear from Mr. Thader. Is it Thader or Thedrick? Mr. Thader. Thader. Sorry, Judge, Thader. Unfortunately, I don't have an A in it. Well, that's fine. I'm sending a vowel. You may need it later. Okay. I will put that in my hip pocket. May it please the court. Judge Robinson looked at the obviousness issue repeatedly and carefully and reached the right decision. And I think if the court doesn't want me to belabor the combination of the three prior references, I'll move on. But if I can just briefly state what they show. The 456 patent shows certain chloroquinolone compositions useful as eye drops. Before the 456 patent, it wasn't claimed to be used as eye drops, so that was sort of a novel contribution, non-obvious contribution to the art. They provide several, again, floxacins, ofloxacin, ciprofloxacin, enoxacin, several of them. They say they're all good for eye drops. Then comes the 470 patent several years later. They bring gatafloxacin and other gatafloxacin-related compounds to the art. And they say you can use these gatafloxacin and other compounds in any of the normal kinds of formulations, including aqueous formulations, liquid formulations, and eye drops. Problem is, they didn't say what kind of excipients to use with it, so there is nothing about EDTA in the 470 patent. But in the 456 patent, EDTA is one of eight excipients that are listed. EDTA is a common excipient, and it's exemplified in the examples of the 456 patent. One of the floxacins, norfloxacin, is exemplified with EDTA. Then there's also the Riley reference. The Riley reference takes a look at the structures and the physical chemical properties and the solution of these fluoroquinolone structures. And it reasons that the structures are very similar. All of these fluoroquinolones have a carboxylic acid group and they have an amine group. And because they have these two ionizable groups and there's a big common core of structure in there, they would be expected to behave similarly in solution. And in fact, they do behave similarly in solution. And so what they showed was they had a predicted or a modeled solubility curve, and this curve is U-shaped because it's ionizable. When the acid is ionized, the solubility goes way up on the one side. When the amine group is ionized, it goes way up on the other side. But they say, look what happens. There's something unpredictable here. We're finding that when we use carboxylic acids in solution with norfloxacin or enoxacin, we're getting points that are inside of this curve. It's inside the U. That means the solubility is tremendously increased. So a person of ordinary... Can you say inside? I'm sorry. It's at least above pH 4. At least at around pH 5, there's several points, 5 and maybe a little above 5, there's several points that line up inside that U, showing that the solubility is higher than would be predicted. And so the person of ordinary skill in the arts, synthesizing using his abilities to implicitly, to reason from implicit disclosures and explicit disclosures, would reasonably predict that if I put EDTA in there, which is already a common excipient used to prevent coloration, used to increase corneal permeability, used to be a preservative, used for several purposes. If I put EDTA in there, and the claims were, until they were construed, were unbound by the concentration of EDTA. But once construed, they're bound at 2.2% at the upper limit. If I put EDTA in these claims, I'm going to get it. I'm going to reasonably be likely to get increased solubility. And when I get increased solubility, the ability to prevent precipitation will be increased as well. And the last of those propositions comes from, comes from just the knowledge of the person of ordinary skill in the arts. It's a scientific principle. It's like saying, water doesn't freeze at 32 degrees, ice melts at 32 degrees. It's a distinction without, it's flip sides of the same scientific principle. If you have solubility, you can't precipitate. It's impossible. It's a law of thermodynamics. Right. You can. And if you throw enough of the stuff in, sooner or later, it'll precipitate. You'll reach the point at which it precipitates. The question is where on the curve that point is reached. Okay. Yes, I'm sorry. All right. Well, so, but Mr. Kelly is taking issue with the application of that last principle to this case. So if you could address his argument. I will do that, Your Honor. Good. Okay. So Mr. Kelly comes in with tests of one species in the prior art, a single species, norfloxacin with a single amount of EDTA, 0.01%, 20 fold less than the maximum amount of the range of EDTA possible for his claim. And it comes in with those tests and he presents them to Judge Robinson. Judge Robinson. And they're freeze-thawed tests. And he says, oh, we did these freeze-thawed tests. So what were the tests? Well, there were three experiments done in series. First, 10 vials, 10 samples of this norfloxacin solution were frozen and thawed. How can we look at those tests? I'm sorry? How can we look at those tests? Well, I think those tests are irrelevant also, Your Honor. But counsel, I'm giving counsel the benefit of the doubt. He's claiming that they are somehow secondary considerations of unexpected results. I think that what is perfectly expected is you raise solubility, you're going to raise the ability to prevent precipitation. But I think, I think Senju was saying that in this one case, the law of thermodynamics or the laws of science are suspended. But the point I'm trying to make is that the judge, listen to all of the evidence in the evidentiary hearing after trial, the tests were not performed until after trial and after judgment in this case. The judge, nevertheless, listened to these, to testimony about these experiments. And the judge found what? That the experiments were not probative. That the testimony was not credible, testimony of the experts. And what, so what was, what was the testimony? Well, there were three tests. First they did 10 vials or 10 samples of this norfloxacin 0.01% EDTA solution and 10 vials without the EDTA. And they froze and thaw and froze and thaw and they give it to their statistician and their statistician says, not statistically significant. Why don't you make some changes to these tests? Why don't you up the, the end, the end to 30, do 30 of each. And why don't you blind, blind the, the scientist so he doesn't know which has got EDTA and which doesn't. And he made some other suggestions of what he should do. So they go back and they run the 30 samples with and 30 samples without. And what do they get? They, they get some precipitation that, that they don't know what it is. It's just precipitation. But they get some precipitation and they send it back, the numbers back to their statistician who crunches the numbers and he says, oh, it's not statistically significant at the 0.5%, at the 0.05 level. So, so what should we do? Well, tell them to raise it to 45 of each. So they do 45 without the EDTA, 45 with EDTA. They run it through the freeze-thaw cycles and they give it to the statistician and the statistician says, oh yes, now this is, I got a result here that is significant at 0.05. So he's got, he's got experiment one, not significant, experiment two, not significant, experiment three, he says it's significant. So what does he do? He puts all of the tests together. He does some meta-analysis and he says, oh, when I put all of these tests together, even though I've got disparate results, not significant, significant, and even though I've changed the protocol from experiment one to experiment two, and I cross-examination, he conceded that he changed the protocol and he probably shouldn't have put those numbers together, but he did. He mushed all those numbers together. He said, ah, look at this. I've got one data point for one norfloxacin solution with one tiny amount of EDTA in it, and therefore I've disproved the law of science. I've suspended that particular law of thermodynamics. Science doesn't work in norfloxacin. Now, so the judge found it to be not credible, found that, and she said, you know, that it was irrelevant at best, and the quote is in her opinion. I don't have it memorized. I apologize, but I'm not going to dwell on that. So, but what other reason is this not relevant? Legally, legally, if assuming the best, that this was supposed to be evidence of secondary considerations, unexpected results, what you do there is you show that the prior art contained, you know, some number of these solutions, and the prior art contained a lot of different floxacins, a lot of different quinolones, enoxacin, kiprofloxacin, ofloxacin, all the floxacins I talked about, and the prior art reference suggests carboxylic acids at a pretty good range. In fact, up to equimolar of quinolone and equimolar with EDTA, with a carboxylic acid. So, what they did, though, instead of testing a modicum of samples in the prior art, they used one single species out of the whole genus of prior art examples, or the whole genus of prior art solutions of fluoroquinolones and EDTA. And they say, this one sample, because I found one instance where it doesn't work, how a person of ordinary skill in the art would reasonably predict, I've rebutted something. But that's not the test. The test is that you have to show that there's, you know, take a low amount of EDTA, a higher amount of EDTA, the upper amount of the range, show a span. Don't use only one drug, nor floxacin. Even Riley had enoxacin in there, and Riley said all of these fluoroquinolones are structurally similar and would be expected to behave the same. So, out of a genus of, you know, I want to be conservative here, thousands, and probably there's more than thousands, of quinolone solutions that have EDTA in it, they select one, and it doesn't have anywhere near an equal molar ratio. And they say, oh, because we found this one, that it disproves the law of thermodynamics. So, I think that... Well, suppose it did. I mean, suppose we accept that that test is a reliable test for the performance of a EDTA. What then? Where does that lead us analytically? There's two places. One is the last argument I made is I think that a single test of a single prior... Let's suppose, but remember, I'm saying, suppose Judge Robinson had said, not only am I persuaded that this test has integrity, but I think it is generalizable, and it shows a tendency with respect to all quinolones with EDTA. I think that might be an error of law for the reason that I said before, and that is, it's one thing when you have a small, narrow claim, and you compare it to the closest prior art and show a difference. But here we have a huge prior art, and a huge prior art with lots of different fluoroquinolones and lots of different concentrations of EDTA that can be used. And we have a single fluoroquinolone being claimed, and a pretty good-sized range of EDTA concentrations. I don't understand this at all. I mean, putting together the EDTA with the gataploxin does prevent precipitation,  Correct. The test is designed to show that it doesn't? That's the peculiar aspect of all of this for me as well. I mean, where are we going with this test? In the direction opposite to what the patent is claiming? Well, that is precisely, I think, what counsel is trying to persuade this court of. That's why I'm asking you.  unanswerably true. Then legally, Your answer is, well, that's legal error. That's not a good answer. Well, let me try to say, it doesn't support the non-obviousness of the claims, because the tests are not commensurate with the scope of the claim. The scope of the claim is much broader than this one single test. Secondly, there's a freeze-thaw test. If you were doing secondary considerations, you'd do a test, you'd say, the combination works, and it shows unexpected properties. It shows that it doesn't work. I don't see what it has to do with anything. I agree with you, and let me suggest, Your Honor, that the reason it doesn't make any sense is because there wasn't a control test being done at the same time where gadafloxacin was put in there, and so that you could show if there was, in fact, a difference. Rather, what Senger's doing here is they're relying on the presumption of validity, saying, well, the patent says that this happens, and so it happens. The other point that I'd like to make is that freeze-thaw limitation, there's no freeze-thaw limitation in this claim. It's just a claim for raising solubility. There was a Markman hearing in this case. Both sides presented briefs and oral argument at Markman. Neither side presented any argument that freeze-thaw limitation is a portion of preventing precipitation. The judge gave Senger exactly the claim construction that they urged. So Senger won at the Markman hearing, and the judge, in her opinion, when Senger put in some arguments about freeze-thaw, in her opinion, Judge said freeze-thaw is not a limitation of the claim. So they won at the Markman hearing. They were admonished in the opinion that freeze-thaw is not a part of the claim, and they have not assigned any error to that holding by the district court. So in any way that you can raise the solubility of a floral, point alone, gadafloxacin that would be reasonably expected by the person of ordinary skill in the art to raise the solubility, the flip side of it, intertwined and not removable from it, is that it will prevent precipitation. It's a law of science. There's one more reason. Well, I'm out of time, Your Honor, but I would have liked to have talked about our waiver on appeal arguments, and if you would indulge me in one minute. Well, you know, I don't know if the other judges feel differently, but I thought that that was more of a distraction than an assistance to us. Appellants are not only entitled but indeed encouraged by this court to waive arguments on appeal that they don't want to raise, but that doesn't mean they are deemed thereby to have waived arguments that they do want to raise, and those arguments stand on their own. As far as I'm concerned, I carry over no implication from arguments not raised on appeal to arguments that have been raised, so I hope the other judges feel differently. If I may just respond briefly to that, I'll say it's not an argument. Be careful because you're losing, you have to lose ground, but go ahead. I would say it's not an argument that was waived. It was a claim that was waived. The entire claim was waived. There was a re-examination. In the re-examination, there was a disclaimer of the entire subject matter. Claim 8 was rejected by the patent office, and after the rejection was read, they said, okay, we concede, we drop Claim 8, so the entire subject matter of Claim 8 is in the public domain. Claim 8 and Claim 7 have the same stuff. Thank you, Your Honor. Thank you. In the public domain, but not in the prior art. I don't know the difference. I understand the distinction. Yes, I think it's an important distinction in this case. All right. Thank you, Your Honor. Thank you. Mr. Kellogg. I'm going to try and explain the purpose of the two tests. If norfloxacin and gadafloxacin behave the same way, then there should have been, norfloxacin EDTA combination should have inhibited the rate of precipitation. It didn't. It's unexpected that gadafloxacin in this test, in these tests, prevents precipitation because solubility isn't the issue. It's soluble when it goes into the test. It's soluble many times when it comes out. With EDTA, the solubility after the test, it can go through a lot more cycles than without it. So the test shows the unexpected results that norfloxacin and gadafloxacin behave differently. As far as the solubility thermodynamics, I think it's important to note that even Riley talks about thermodynamics. When you say they behave differently, they behave differently between one another or they behave differently between one another? Between one another. So norfloxacin and gadafloxacin didn't behave the way it was predicted. The other thing is, you're looking at thermodynamics, but thermodynamics is not the only factor going on here. Even Riley on page A1880 talks about kinetics trumping thermodynamics. And he's talking about disillusionment, where it didn't go the way he expected it to go and it's because of thermodynamic effects. Kinetic effects, excuse me. And kinetics is also going on here. And so you just can't look at solubility. Riley says you can't. Browers says you can't. And Browers is concerned with preventing precipitation. In 2009, he doesn't use EDTA. And if I could just say...